STATE OF MINNESOTA            )
                              ) s.s.   Affidavit of Special Agent Andrew Gibart
COUNTY OF HENNEPIN            )

I, ANDREW GIBART, being duly sworn under oath, depose and state as follows:

1. Since June 2003, I have been employed as a Special Agent of the Internal Revenue Service – Criminal Investigation. My responsibilities include conducting investigations involving possible criminal violations of federal laws, specifically Title 26, Title 18 and Title 31 of the United States Code. I have received training at the Federal Law Enforcement Training Center that included studies of financial crimes, criminal investigations, search and seizure and violations of federal statutes, among other topics.

2. This affidavit is made in support of a complaint for forfeiture against real property located at 10903 Purdey Road, Eden Prairie, Minnesota, and real property located in Taney County, Missouri. As further alleged below, the real property is traceable to the proceeds of mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343, and is therefore subject to civil forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C). In addition, the real property was involved in or traceable to money laundering in violation of 18 U.S.C. § 1957, and is therefore subject to civil forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A). I have not included each and every fact known by me concerning the individuals and events described herein, rather only the facts that I believe are necessary to support a reasonable belief that the real property is subject to forfeiture to the United States. The information contained in this affidavit is based on my firsthand

knowledge, review of records, and information provided by other law enforcement officers and witnesses.

## BACKGROUND OF THE INVESTIGATION

3.  I am currently working on an investigation into money laundering, wire fraud and mail fraud perpetrated by TRAVIS SCOTT ("SCOTT"). On October 2, 2007, SCOTT filed a Certificate of Assumed Name with the Minnesota Secretary of State for SECURITY MANAGEMENT TECHNOLOGIES (SMT), listing himself as President and the only person or company conducting business under that name. The principal place of business of SMT is listed as 9813 Valley View Road, Eden Prairie, MN 55344.

### Insurance Claim

4.  On June 30, 2007, SCOTT purchased an insurance policy for SMT. The policy was a property and casualty business line that covered both the property of the business (supercomputers) and business interruption from loss of use of this property. If damage/loss were to occur to the property, SCOTT would have the option of taking "cash value" of the property as determined by the insurance company, or choosing a "replacement option," which would replace the property (in this case, supercomputers) up to the policy limits. Additionally, the policy covered "business interruption" in the event of damage to the property. Zurich North America ultimately held the insurance policy purchased by SCOTT. The original policy covered SMT's property for $7.5 million. In approximately December 2007, the policy was increased to $9.5 million because SCOTT alleged that he purchased new computer equipment for SMT.

5. On June 1, 2008, almost one year after purchasing the SMT policy, Scott reported to Zurich that his business had been struck by lightning and sustained damage to his computer equipment. Zurich contracted with local independent insurance adjusters to investigate and process the claim. Zurich's independent adjusters reached the conclusion that the computers were damaged and should be replaced. Based on this recommendation, Zurich allowed Scott to salvage his computers; Zurich never took physical custody of them.

6. In early June 2008, SCOTT contacted Silicon Graphics, Inc. (SGI) in Eagan, MN, purportedly to order replacements for the damaged supercomputers and peripherals. Throughout the summer of 2008, SCOTT and SGI went through several different system set-ups until SCOTT was satisfied with the system.

7. At the same time that Scott was working with SGI on a new supercomputer system, he was requesting that Zurich send monetary advances on his insurance claims so he could make down payments to SGI and they could then begin building the system. For its part, however, SGI had not requested down payments. On or about June 27, 2008, Zurich issued Scott a check for $2.5 million. On or about July 23, 2008, Zurich issued SCOTT another $2.5 million check, based on SCOTT's representation that he needed to make another down payment to SGI. On August 29, 2008, Zurich issued SCOTT a check for $4,560,000.00, representing the final payment on the "contents" portion of his claim (covering the property, the supercomputers). These payments were based in part on faxed communications. For example, on or about August 13, 2008,

SCOTT faxed to Zurich his purported invoice from SGI. The fax contained the following false statement from SCOTT: "As of August 12th all of the equipment has been delivered and the system is in the beginning stages of operation."

8. In fact, the computer system ordered by SCOTT was never completed or delivered, and the funds SCOTT received from Zurich were never paid to SGI.

9. The accounting firm of Matson, Driscoll & Damico, and LLP was brought in by Zurich to establish the business interruption portion of SCOTT's claim. Working from information provided by SCOTT, which included a 2007 U.S. Corporation Income Tax Return (Form 1120) for SMT and SMT Income Statements, the accounting firm determined that SMT's average monthly revenues between June 2007 and May 2008 were $671,736.00. Based on the accounting firm's analysis, on December 11, 2008, Zurich issued a business interruption check to SCOTT for $1,931,217.00.

10. Your affiant reviewed records from Xcel Energy relating to the energy consumption for SCOTT's business location of SMT, 9813 Valley View Rd., Eden Prairie, MN. For each month of 2008, the monthly usage ranged between approximately 600 and 2000 kilowatts. According to an SGI employee who prepared the electrical and cooling requirements for SCOTT's new system, the average energy consumption of SCOTT's old system would have been approximately 64,000 kilowatts per month had the machines been operating as portrayed by SCOTT.

11. SCOTT received 4 checks from Zurich. These checks included two separate checks of $2.5 million each, and a check for $4,560,000,00, which collectively represented the total amount of SCOTT's policy with Zurich and total payment for the "contents" portion of his claim. The fourth check issued by Zurich, for $1,931,217.00, represented the business interruption portion of the claim.

12. SCOTT utilized the funds received from Zurich to, among other things, purchase real and personal property. On January 6, 2009, SCOTT withdrew $715,713.51 from TCF Bank account # ******5218 and obtained TCF Bank cashier's check # 100132103, made payable to Wells Fargo Home Mortgage, RE: Loan ******2304. The check paid off the remaining balance of SCOTT's mortgage loan for his residence located at 10903 Purdey Road, Eden Prairie, MN 55347.

13. On August 13, 2009, SCOTT completed a wire transfer from TCF Bank account # ******5218, sending $96,607.99 to Land Choice – Tri-Lakes Title and Escrow for the purchase of a property on Windmill Rd., Taney County, MO. This transfer was funded with the proceeds of fraud.

## **CONCLUSION**

14. Based the information provided above, there is a reasonable belief that the defendant real properties are subject to forfeiture to the United States.

Further your affiant sayeth naught.

s/ Andrew Gibart_____<br>
ANDREW GIBART<br>
SPECIAL AGENT<br>
Internal Revenue Service<br>
Criminal Investigation

Subscribed and sworn to before me
this  _15th_  day of November, 2010.

s/ Kathryn M. Weston_____
NOTARY PUBLIC